**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
————————————————————
                          )
CHRISTI JOHNSON, et al.,   )
                          )
        Plaintiffs,        )
                          )       Civil Action
    v.                     )       No. 03-2548 (GK)
                          )
DISTRICT OF COLUMBIA, et al., )
                          )
        Defendants.        )
                          )
————————————————————
```

<u>**MEMORANDUM OPINION**</u>

Plaintiff, Christi Johnson, brings this action in her individual capacity and on behalf of the estate of her son, Tyrone David Christian. Defendants are the District of Columbia ("the District" or "D.C."), Gayle Turner, the Administrator of the D.C. Youth Services Administration ("YSA"),[1] and Dytrad Management Services, Incorporated ("Dytrad"). Pursuant to 42 U.S.C. § 1983, Plaintiff seeks damages for violations of her late son's constitutional rights. Plaintiff also seeks damages under the common law of the District of Columbia for Defendants' alleged negligence.

This matter is currently before the Court on the District Defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [Dkt. No. 73] and Dytrad's Motion for Judgment on the Pleadings [Dkt. No. 81]. Upon consideration of

---

[1]   Hereinafter, the Court will refer to the District of Columbia and Turner collectively as the "District Defendants."

the Motions, Oppositions, and Replies, and the entire record herein, and for the reasons set forth below, the District Defendants' Motion is hereby **granted** and Dytrad's Motion is hereby **granted**.

I.   **BACKGROUND**

     A.   **Facts**

     The tragic facts of this case are for the most part undisputed.[2] On October 18, 2001, Tyrone David Christian, sixteen years old, was shot outside his home on Martin Luther King Avenue in the District of Columbia by Paul Andre Coleman, a juvenile whose precise age is not given.[3] Am. Compl. ¶ 9.  Within minutes of the shooting, he died in the arms of his mother, the Plaintiff.  Id. ¶ 11.

     Approximately sixty days before the shooting, Paul had escaped from the Gateway IV Group Home, a residential facility for troubled youth in the District of Columbia.  Id. ¶ 12.  The Gateway IV Group Home is controlled by the YSA, an agency of the District of Columbia, and operated by Dytrad, with which YSA contracted for that purpose.  Id. ¶¶ 12-13.  Plaintiff claims that Defendants knew

---

     [2]  In the current procedural posture, the Court must accept Plaintiff's factual allegations as true and construe any inferences that may be drawn therefrom in the light most favorable to her. See Peters v. Nat'l R.R. Passenger Corp., 966 F.2d 1483, 1485 (D.C. Cir. 1992).

     [3]  Since both Tyrone and Paul are juveniles, they will be referred to by their first names.

that Paul had absconded on two prior occasions and negligently failed to supervise him accordingly, a failure that she argues caused her young son's untimely death. Id. ¶ 12.

At the time of Tyrone's death, Plaintiff was unaware that Paul was a ward of the District and had escaped from its custody. Id. ¶ 15. She learned that fact from a Washington Post reporter who contacted her in January 2003. Id. According to Plaintiff, she also learned that juveniles within the District's custody escaped 782 times during the ten-month period in which her son was killed, id. ¶ 16, and that twenty teenagers committed serious crimes in the District after absconding from group homes or jails between 1998 and 2002. Id. ¶ 17. Furthermore, she alleges, "only two police officers [are] assigned to locate approximately 600 runaways a year." Id. ¶ 19.

**B.   Procedural History**

Plaintiff filed her Complaint in the District of Columbia Superior Court on July 16, 2003. Invoking this Court's jurisdiction pursuant to 28 U.S.C. § 1331, Defendants filed a Notice of Removal on December 16, 2003. With leave of the Court, Plaintiff amended her Complaint on May 27, 2004, adding Dytrad as a Defendant. See Dkt. No. 9. On June 21, 2005, the District filed a counterclaim against Dytrad seeking, inter alia, indemnification or contribution for any liability it might incur in this litigation. See Dkt. No. 67.

On July 7, 2005, the District Defendants filed the instant Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [Dkt. No. 73].  Plaintiff opposed that Motion on July 29, 2005 [Dkt. No. 79] and the District Defendants filed their Reply on August 12, 2005 [Dkt. No. 84].

Dytrad filed its Motion for Judgment on the Pleadings [Dkt. No. 81] on August 4, 2005.  Plaintiff's Opposition [Dkt. No. 85] and Dytrad's Reply [Dkt. No. 86] were filed August 15, 2005 and August 22, 2005, respectively.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed but within such time frame as not to delay the trial, any party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings will be granted if the movant shows, at the close of the pleadings, that no issue of material fact remains to be resolved, and that he or she is entitled to judgment as a matter of law.  See Terry v. Reno, 101 F.3d 1412, 1423 (D.C. Cir. 1996); Haynesworth v. Miller, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987); Summers v. Howard University, 127 F. Supp. 2d 27, 29 (D.D.C. 2000).

The standard of review for a Rule 12(c) motion is "virtually identical" to that which governs motions to dismiss pursuant to Rule 12(b)(6).  Haynesworth, 820 F.2d at 1254; Robinson v. District of Columbia, 403 F. Supp. 2d 39, 47 (D.D.C. 2005).  Accordingly, a

motion for judgment on the pleadings may be granted only if it appears, based on the allegations set forth in the complaint, that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984). Because such motions "summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, [they] should be treated with the greatest of care." Haynesworth, 820 F.2d at 1254.   The factual allegations of the complaint must be presumed true and liberally construed in favor of the plaintiff.   Shear v. Nat'l Rifle Ass'n of Am., 606 F.2d 1251, 1253 (D.C. Cir. 1979).

A court may not consider matters outside the pleadings and is "limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record." Robinson, 403 F. Supp. 2d at 47 (citing EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997)).   Although the court must construe the complaint in the light most favorable to the non-moving party, it "need not accept inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

III.  **ANALYSIS**

    A.    **The District Defendants Are Entitled to Judgment on the Pleadings Because Plaintiff Has Failed to State a Valid Substantive Due Process Claim and Her Negligence Claims Are Barred by the Public Duty Doctrine**

        1.    **Plaintiff's constitutional claim fails as a matter of law**

In Count I of her Complaint, Plaintiff contends that by acting "with deliberate indifference" to his safety, the District Defendants "deprived Tyrone David Christian of his interests in life and property under the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983."[4]  Am. Compl. ¶ 21.  Defendants' actions, she argues, not only resulted in her son's death, but also caused her to suffer, inter alia, "mental anguish, emotional pain and suffering, [and] loss of society."  Id. ¶ 24.

According to the District Defendants, however, Plaintiff's constitutional claims fail as a matter of law.  To establish a substantive violation of the Fifth Amendment's Due Process Clause, they argue, Plaintiff must demonstrate that Tyrone suffered an unlawful deprivation of either a protected property or liberty

---

    [4]  As the District Defendants point out, Plaintiff's due process claims actually arise under the Fifth Amendment. See District Defs.' Mot. at 5 n.2.  The Fourteenth Amendment applies to states only, and thus not to the District of Columbia. Nevertheless, the full protection of the Fourteenth Amendment has been extended to residents of the District of Columbia through the Fifth Amendment's Due Process Clause.  See Bolling v. Sharpe, 347 U.S. 497, 499 (1954).

interest.  See District Defs.' Mot. for Judgment on the Pleadings at 5 (hereinafter "District Defs.' Mot."). The District Defendants contend that she cannot do so on the facts of this case.

> **a.**   **Tyrone Christian did not have a protectible property interest in the supervision of Paul Coleman**

Plaintiff argues that by failing to restrain Paul while he was in their custody, and to retrieve him after he escaped, Defendants violated Tyrone's "constitutionally-protected property interest in the supervision of group home residents within the juvenile justice system and the retrieval of absconders from group homes." Opp'n at 5. According to the District Defendants, however, neither Tyrone, nor any member of the public, can claim a cognizable property interest in "state prevention of criminal acts by a third party." District Defs.' Mot. at 5.

The Fifth Amendment protects citizens against deprivation of "life, liberty, or property without due process of law." U.S. CONST. amend V. The Supreme Court has explained that "property" in this context encompasses more than real estate or personal chattel and can include certain government benefits, including, inter alia, welfare payments, public education, and, in limited cases, employment. See Goldberg v. Kelly, 397 U.S. 254 (1970) (welfare benefits); Goss v. Lopez, 419 U.S. 565 (1975) (public education); Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985) (government employment).

-7-

To have a protectible property interest in a benefit, an individual must "have more than an abstract need or desire . . . and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). Such entitlements derive not from the Constitution, but "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Paul v. Davis, 424 U.S. 693, 711 (1976). "A benefit is not protected if government officials may grant it or deny it at their discretion." Town of Castle Rock v. Gonzales, 124 S. Ct. 2796, 2803 (2005).

To succeed on her claim that Tyrone had a constitutionally-protected property interest in Paul's supervision or restraint, Plaintiff must establish that he had a "legitimate claim of entitlement" to such protection, which derives from an "independent source such as state law." Paul, 424 U.S. at 711. Plaintiff does not, and cannot, point to any District of Columbia law entitling citizens in general, or her son in particular, to protection from escaped juvenile offenders. Nevertheless, she argues that such an entitlement arose from the 1986 Consent Decree entered in District of Columbia v. Jerry M.. See 571 A.2d 178 (D.C. 1990). That Consent Decree is the only authority on which Plaintiff relies as the basis for her claim that citizens,

including her son, had an entitlement to protection from escaped juvenile offenders.

In _Jerry M._, a class of youth offenders in the custody of the District's juvenile justice system challenged that system on the ground that it failed to provide adequate education and rehabilitation opportunities.  _Id._ at 180-81.  In settling that case, the District agreed to "design . . . placement alternatives for youth no longer requiring secure confinement . . . [and to] implement a juvenile justice system with a variety of community based services and thereby reduce the time youth were inappropriately housed in secure facilities." _Jerry M._, 571 A.2d at 180; _see also_ _Turner v. District of Columbia_, 2006 WL 566121 at *8 (D.D.C. Mar. 7, 2005).  Specifically, the Consent Decree required "increased use of diversion from prosecution, temporary housing for youth whose parents cannot be located, increased use of 'home detention,' short term foster care, alternatives to secure detention . . . new treatment facilities . . . and improved record keeping and monitoring of placements." _Jerry M._, 571 A.2d at 182.

By entering into this agreement, Plaintiff argues, "Defendants affirmatively assumed control of those juveniles committed to the juvenile justice system who would be housed and cared for in group homes and thus [] became liable for the supervision of the juveniles residing in the group homes and absconding therefrom." Opp'n at 6.  As a result, "Defendants created an entitlement for

-9-

Plaintiff and Christian . . . [because] the creation of the group homes became an independent source and a legitimate claim to entitlement." <u>Id.</u> at 7.

Plaintiff's argument is unconvincing for at least three reasons. First, whether it derives from state law or, as Plaintiff alleges here, a consent decree binding a municipality, the "independent source" underlying a property interest in a particular benefit must be clear enough to provide a citizen with "an objectively reasonable expectation that he is entitled to" that benefit. <u>Hall v. Ford</u>, 856 F.2d 255, 266 (D.C. Cir. 1988). Notwithstanding Plaintiff's characterization, however, the <u>Jerry M.</u> Consent Decree does not impose on the District a duty either to prevent abscondences from juvenile group homes or to arrest any individuals who may escape. <u>See Turner</u>, 2006 WL 566121 at *9. As a result, the <u>Jerry M.</u> Consent Decree cannot have given Plaintiff, or Tyrone, an "objectively reasonable expectation" of the benefit she now claims. <u>Hall</u>, 856 F.2d at 266.

Second, and more importantly, a substantive due process claim alleging deprivation of a protected benefit cannot succeed if "government officials may grant or deny [the benefit] in their discretion." <u>Town of Castle Rock</u>, 125 S. Ct. at 2803. Unless the Government's provision of a particular benefit is mandatory, therefore, an individual cannot claim a constitutionally-protected interest in it. In language that is directly relevant, and fatal,

to Plaintiff's claim, the Supreme Court has recently explained that individuals do not have a property interest in police protection generally, or even in the detention or arrest of a particular individual, because the "well-established tradition of police discretion" allows officers to decide whether and when to make an arrest.  <u>Town of Castle Rock</u>, 125 S. Ct. at 2805-06.

<u>Town of Castle Rock</u>, a case with facts even more tragic than those contained in Plaintiff's Complaint, illustrates how difficult it is for a citizen to claim a property interest in police protection.  In that case, the plaintiff had obtained a restraining order barring her estranged husband from coming within 100 yards of her or their three daughters.  <u>Id.</u> at 2801.  On its face, the restraining order directed "law enforcement officials" to "use every reasonable means to enforce this restraining order."  <u>Id.</u> Addressing such law enforcement officials, the order provided that "You shall arrest or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of the restrained person. . ."  <u>Id.</u>  Nevertheless, when the estranged husband appeared at plaintiff's home one afternoon, the police declined to intervene despite her numerous 911 calls asking them to enforce the order.  <u>Id.</u> at 2801-02.  Early the following morning, the estranged husband abducted the young girls, drove to the local police station, and died after initiating a firefight with officers on duty.  <u>Id.</u> at 2802.  When the police searched the truck he was

driving, they discovered the bodies of his daughters, whom he had murdered.  Id.

Notwithstanding the seemingly-mandatory language contained in the restraining order, the Supreme Court held that the plaintiff could claim no property right in its enforcement.  "We do not believe," the Court explained, "that . . . Colorado law truly made enforcement of the restraining order mandatory.  A well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes."  Id. at 2805.  Because police officers retained such discretion, the Court concluded that plaintiff could not claim a legitimate entitlement to protection from her husband, and therefore could not maintain her substantive due process claim.  Id. at 2803.

Whereas the restraining order in Town of Castle Rock was drafted to protect particular individuals and seemed to clearly mandate police action, the consent Decree in Jerry M. names no specific beneficiaries and requires no action on the part of the police.  Accordingly, if the plaintiff in Town of Castle Rock had no property interest in the enforcement of the restraining order against her husband, there can be no question that the Jerry M. Consent Decree gave Tyrone no property interest in police protection from escaped juveniles.

Third, and finally, the Supreme Court has made clear that no cognizable property interest arises when the benefit of a

particular government function or program inures to the public at large, rather than to a particular individual or class of individuals.  See Town of Castle Rock, 125 S. Ct. at 2808, 2810. To the extent that the Consent Decree in Jerry M. confers government benefits, they most certainly are indeterminate in nature and designed to improve the welfare of District of Columbia residents as a whole, by creating greater opportunities for juvenile offenders and, thereby, reducing the social costs associated with juvenile delinquency.  At most, if the Consent Decree confers benefits to any particular individual or class of individuals, it is to the young people in the juvenile delinquency system who have been placed in the custody of the Youth Services Administration for their "care and rehabilitation."  See D.C. CODE §2-1515.04.  Plaintiff cannot reasonably claim that either she or her son are members of a discrete class that the Consent Decree was designed to serve.

Accordingly, Plaintiff cannot establish that Tyrone suffered any deprivation of a constitutionally-protected property interest.

> **b.   Because the District did not affirmatively create the harm that befell Tyrone Christian, his liberty interests under the Due Process Clause were not violated**

Since Plaintiff cannot claim a valid property interest in police protection, she must establish that Defendants violated one of Tyrone's cognizable liberty interests in order to succeed on her substantive due process claims.  Plaintiff argues that Tyrone's

"right to life is clearly encompassed in the protected right of liberty within the Fifth Amendment." Opp'n at 8. By failing to properly supervise Paul, Plaintiff alleges, Defendants acted "with deliberate indifference" to the safety of Tyrone, "created . . . and aggravated" a "dangerous situation" that led to his death, and, in so doing, violated his Fifth Amendment rights.[5] Id. at 9, 12.

The District Defendants do not dispute that Tyrone had a protected liberty interest in his life, nor that a due process claim alleging violation of that interest might succeed under a different set of facts. See District Defs.' Mot. at 10. This is not such a case in their view, however. For Plaintiff's claim to succeed, the District Defendants contend, she must present evidence of "affirmative conduct on the part of the government" that directly endangered her son. Id. at 11. At most, however, the conduct here amounted only to a "failure to act" rather than "affirmative conduct." Id. at 10.

It is well-established that "nothing in the Due Process Clause itself requires the State to protect life, liberty, and property of its citizens." DeShaney v. Winnebago County Dep't of Social Services, 479 U.S. 189, 195 (1989). "[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even

---

[5] As the District Defendants note, Plaintiff incorrectly invokes the "deliberate indifference" standard in support of her Fifth Amendment claims. That standard governs liability under the Eighth Amendment, see Estelle v. Gamble, 429 U.S. 97, 104 (1976), and is wholly inapplicable in this context.

where such aid may be necessary to secure life, liberty, or property interests of which the government may not deprive the individual." <u>Id.</u>   As a result, a "State cannot be held liable under the [Due Process] Clause for injuries that could have been averted . . . [and therefore] a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." <u>Id.</u> at 197.

Notwithstanding this general principle, however, there are two limited circumstances in which the Due Process Clause imposes liability on government entities for injuries a citizen suffers at the hands of a third party.  First, in what has been described as the "custody exception," the Supreme Court has explained that if the state "takes a person into its custody and holds him against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being" and any failure to meet that duty is actionable under the Due Process Clause. <u>Id.</u> at 199-200.  Second, in this jurisdiction, under the so-called state endangerment theory, "an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm." <u>Butera</u> <u>v. District of Columbia</u>, 235 F.3d 637, 651 (D.C. Cir. 2001).

Our Court of Appeals has cautioned, however, that the state endangerment theory is to be narrowly construed in order to "differentiate substantive due process, which is only to protect against arbitrary government action, from local tort law." Id. Accordingly, to make out a state endangerment claim, the plaintiff must show that "the District of Columbia's conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Id. (internal quotation and citation omitted). Generally, governmental conduct "shocks the conscience" when it involves "deliberate decisions of government officials to deprive a person of life, liberty or property." Fraternal Order of Police Dept. of Corrections Labor Committee v. Williams, 375 F.3d 1141, 1146 (D.C. Cir. 2004) (citing Daniels v. Williams, 474 U.S. 327, 331 (1986) (emphasis in original).

Plaintiff invokes the state endangerment theory here. The District, she argues, created a dangerous situation that led to Tyrone's death by "fail[ing] to properly supervise juveniles who have a known propensity for absconding, thus allowing dangerous juveniles to intermix with the immediate public." Opp'n at 9. She further argues that Defendants failed to adequately supervise the employees charged with monitoring juveniles like Paul, a failure

that she characterizes as "deliberate indifference" to the "rights of inhabitants" of the District of Columbia.  Id. at 11.[6]

Applying the principles outlined in Butera to the facts of this case, there can be no question that Plaintiff's claim fails as a matter of law.  First, under the state endangerment theory, an individual's due process rights are violated by affirmative action on the part of the government that creates or increases the danger that ultimately befalls him.  The Defendants' "actions" on which Plaintiff bases her claim, however, are not actions at all.  According to her, Defendants violated Tyrone's liberty interests by failing to keep Paul in their custody, by failing to train and supervise the officials charged with his care, and by failing to

_____

    [6]    Plaintiff relies chiefly on Ashford v. District of Columbia, 306 F. Supp. 2d 8 (D.D.C. 2004), to support her "deliberate indifference" argument.  In that case, the court found that an inmate could state a substantive due process claim against the District after he was violently assaulted while in custody. Ashford, 306 F. Supp. 2d at 14.  The court found that officials at the D.C. jail acted with deliberate indifference, and thereby violated plaintiff's constitutional rights, by ignoring his repeated pleas for protection from a gang of other inmates who had threatened to kill him.  Id.
    Contrary to Plaintiff's assertions, however, Ashford is both legally and factually distinguishable from this case.  First, Ashford concerned the "custody exception" described in DeShaney. Here, by contrast, Plaintiff claims to be grounding her claim in the state endangerment theory.  Second, the facts of Ashford are wholly inapplicable to this case: in Ashford, the court found that the District violated a duty to the plaintiff because it had taken him into custody and thereby assumed a duty to ensure his reasonable safety.  Here, however, Tyrone was never in the District's custody.  Consequently, Plaintiff's claim that the District owed him a constitutional duty of care, under the reasoning of Ashford, cannot be accepted.

find and arrest him after he absconded.   However, failure to act is, by definition, not action itself.   Moreover, as a matter of constitutional law, the government's failure to act does not give rise to a due process claim.   See Butera, 235 F.3d at 650 ("No constitutional liability exists where the State actors 'had no hand in creating a danger but [simply] stood by and did nothing when suspicious circumstances dictated a more active role.'") (quoting Reed v. Gardner, 986 F.2d 1122, 1125 (6th Cir. 2003); see also Turner, 2006 WL 566121 at *6 (noting that "failure to act is not an affirmative act [and] . . . does not amount to a constitutional violation").

Second, the Defendants' "actions," which are in effect inaction, cannot be deemed to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Butera, 253 F.3d at 651 (internal quotation omitted).   The failure to supervise and restrain Paul while in the group home, alleged by Plaintiff, does not satisfy this requirement.

The harms that befell Tyrone, and Plaintiff, are sad beyond words.   They are not, however, constitutionally cognizable. Accordingly, judgment on the pleadings must be entered in the District Defendants' favor on Plaintiff's due process claims.[7]

_____

[7] Because the Court concludes that Plaintiff's constitutional claims fail on the merits, there is no need to discuss the District Defendants' alternative argument that they are barred by qualified immunity.   See District Defs.' Mot. at 15-17.   However, it would appear that the District of Columbia has a strong likelihood of

**2.   Plaintiff cannot prevail on her negligence claims because they are barred by the public duty doctrine**

Counts two through five of the Amended Complaint allege various common law negligence claims.[8]  See Am. Compl. at 5-10. While they differ in some of their particulars, all of the negligence claims center on the following allegations: (1) that Defendants had a duty to protect Tyrone from escaped juvenile offenders; (2) that they breached that duty by failing to monitor and restrain Paul, supervise the employees responsible for doing so, or arrest him after he escaped; (3) that those failures proximately caused Tyrone's death and Plaintiff's injuries; and (4) that Plaintiff is entitled to recover as a result.  See id.

The District Defendants move for judgment on the pleadings as to each of these claims on the ground that they "are barred, in their entirety, by the public duty doctrine." District Defs.' Mot. at 17.  Because the Court agrees that the public duty doctrine governs all of Plaintiff's negligence claims against the District Defendants, it will address them together.

Under District of Columbia law, which the Court must apply to Plaintiff's common law causes of action, negligence claims proceed

———————————————

prevailing on this argument under Estate of Anthony Sean Phillips, Sr. v. District of Columbia, 455 F.3d 397 (D.C. Cir. 2006).

    [8]   Specifically, Plaintiff states the following claims: Negligence (Count II), Wrongful Death (Count III), Negligent Hiring and Supervision (Count IV), and Negligent Infliction of Emotional Distress.  See Am. Compl.

according to a familiar three-part analysis.  The plaintiff must establish: first, that defendant owed a legal duty of care; second, that defendant breached that duty; and, third, that plaintiff "sustained harm as a proximate result of the defendant's breach." Souci v. William C. Smith & Co., 763 A.2d 96, 99 (D.C. 2000).  No negligence claim can lie in cases where the defendant owes no duty of care to the plaintiff.

It is well-established in this jurisdiction that the District Government owes no general duty of care to its citizens.  Instead, "the District is subject to liability for injuries arising from the negligence of its employees only if the duty owed to the plaintiff was a special duty to that person as an individual or as a member of a class . . . [T]he District cannot be sued if the duty it owed was a general duty to the public at large." Auto World v. District of Columbia, 627 A.2d 11, 13 (D.C. 1993) (internal citation and quotation omitted).  This "public duty doctrine . . . shield[s] the District and its employees from liability associated with providing public services," Powell v. District of Columbia, 602 A.2d 1123, 1125 (D.C. 1992), in order to protect the Government from what would be "an overwhelming tide of liability if [it] were liable for mishaps which occur during the provision of public services." Joy v. Bell Helicopter Textron, 1991 Dist. LEXIS 2193 (D.D.C. 1991).

A narrow exception to the public duty doctrine allows a plaintiff to "convert a general duty owed to the public into a

special duty owed to an individual" if she can establish, first, "a direct or continuing contact between the injured party and a governmental agency or official," and, second, "a justifiable reliance on the part of the individual." Klahr v. District of Columbia, 576 A.2d 718, 720 (D.C. 1990) (citing Turner v. District of Columbia, 532 A.2d 662, 667 (D.C. 1987)). This exception applies only if the plaintiff demonstrates "a direct transaction. . . or arm's length relationship in which the city's agent [dealt] directly, in some form, with the person injured" and that "the government . . . engage[d] in an affirmative undertaking of protection on which the victim justifiably relies." Taylor v. District of Columbia, 776 A.2d 1208, 1214-15 (D.C. 2001).

Plaintiff contends that the public duty doctrine does not bar her negligence claims for two reasons. First, she argues that the Consent Decree in Jerry M. "sufficiently created a legal duty, or special duty, which requires Defendants to use reasonable care in supervising group home residents and absconding juveniles" and therefore that she has satisfied the standard set forth in Klahr and Taylor. Opp'n at 14-15. This argument is without merit.

The Court has already held that the benefits of the Jerry M. Consent Decree redound to the public at large, and possibly to the juveniles in the care and custody of the District of Columbia. Plaintiff cannot establish that she, or her son, can claim special benefits under the Consent Decree. Nor can Plaintiff demonstrate,

as <u>Klahr</u> and <u>Taylor</u> require, a "direct transaction" in which the District, or one of its agents, affirmatively undertook the protection of Tyrone .

<u>Klahr</u> is particularly instructive here given the factual similarities between that case and this one.  <u>See</u> <u>Klahr</u>, 576 A.2d at 718.  In <u>Klahr</u>, the plaintiff sued the District, alleging negligence and wrongful death, after a man escaped from a halfway house operated by the D.C. Department of Corrections and committed a double murder.  <u>See</u> <u>id.</u>  As Plaintiff does here, Klahr—who was the executor of the victims' estate—argued that the District negligently failed to restrain the murderer, supervise the employees on duty at his halfway house, or find and arrest him after his escape.  <u>See</u> <u>id.</u> at 719.  Recognizing that the public duty doctrine could bar her claims, Klahr argued that because the murderer had been in the District's custody prior to committing the offense, an "actionable duty toward the public at large and the [victims] in particular" had been established, thereby exposing the District to liability.  <u>Id.</u> at 720.

The D.C. Court of Appeals rejected that logic. "Notwithstanding the great misfortune that befell the [victims]," it explained,

> it is evident that they were the victims of a random criminal attack.  The District of Columbia had not agreed to provide specific protection for [them], nor had it any reason to believe that Mosby [the murderer] posed a danger to the [victims] that was greater in degree than, or different in kind from, the danger he posed to anyone

> else. . . Even if there were, appellants would still have
> to show that the District owed a special duty to the
> [victims] above and beyond that general duty.

Id. Here too, there is no evidence that the attack on Tyrone was anything but random, that he faced any greater or lesser degree of danger from Paul than any other member of the public, or that the District had specifically committed to providing him with protection from Paul or any other juvenile runaway.[9]

In support of her argument that the District can be held liable despite the public duty doctrine, Plaintiff relies chiefly on two cases, both of which are easily distinguishable. See Opp'n

---

[9] The Klahr Court suggested that a different outcome might be proper if the murderer's conviction had given "rise to a presumption that he was dangerous." In that case, it explained, the District would have had a "duty to members of the general public to exercise reasonable care to control" him. See Klahr, 576 A.2d at 721 (citing White v. United States, 780 F.2d 97 (D.C. Cir. 1986), for the proposition that prisons and hospitals have a general duty to protect the public from their inmates or patients if they are presumed dangerous).

Plaintiff seizes on this language and attempts to make a distinction between halfway houses and group homes. Because group homes provide a higher-security environment than halfway houses, she argues, the District makes an implicit assumption that an individual is dangerous by placing him in a group home. See Opp'n at 17. On that basis, she contends that the District had a greater duty to monitor Paul, who was held in a group home, than it did the murderer in Klahr, who lived in a halfway house.

As the District Defendants point out, however, there is no legal or factual basis for Plaintiff's assertion that group-home residents are more dangerous than their counterparts in halfway houses. See Reply at 18. On the contrary, under D.C. law any individual who is adjudicated to constitute a danger to the public cannot qualify for placement in either a group home or a halfway house. See id. at 19; D.C. Mun. R. § 29-6274.1. The distinction Plaintiff attempts to draw between group homes and halfway houses, and thus Klahr and this case, is simply unconvincing.

at 15.  In the first, <u>District of Columbia v. Banks</u>, 646 A.2d 972 (D.C. 1994), an individual was hit and injured by a police car involved in a high-speed chase.  The D.C. Court of Appeals allowed his negligence claim to proceed on the ground that the District's "emergency run statute," which waived sovereign immunity for injuries arising out of such accidents, also contained an implicit waiver of the public duty doctrine.  <u>See</u> <u>Banks</u>, 646 A.2d. at 979-80.  The court's reasoning in <u>Banks</u> is wholly inapplicable here. Contrary to Plaintiff's assertions, unlike the District's emergency run statute, the Consent Decree in <u>Jerry M.</u> does not waive sovereign immunity or create a private cause of action.  It cannot, therefore, also waive the public duty doctrine.  <u>See</u> <u>Turner</u>, 2006 WL 566121 at *12.

Plaintiff's second case, <u>Liser v. Smith</u>, 254 F. Supp. 2d 89 (D.D.C. 2003), is equally unhelpful.  In that case, a citizen who had been shot by a member of the Metropolitan Police Department sued for negligence.  Although the District raised the public duty doctrine as a defense, the court allowed the plaintiff's negligence claim to proceed.  According to the court, the public duty doctrine shields governments from liability for "failure to protect a person" from harm caused by a third party.  <u>Liser</u>, 254 F. Supp. 2d. at 102.  When the alleged harm is caused not by a failure to protect against a third party but by District employees themselves, however, the public duty doctrine is "wholly inapposite."  <u>Liser</u>,

254 F. Supp. 2d. at 102.   According to the court, "the claim that the government has no general duty to protect particular citizens from injury is simply a non-sequitur where the government itself is solely responsible for that injury."   <u>Id.</u>   Plaintiff does not, and cannot, claim that Paul was acting as an agent of the District at the time he shot Tyrone.   As a result, the reasoning of <u>Liser</u> is totally inapplicable on the facts of this case.

Plaintiff's second argument against the application of the public duty doctrine in this case "invites the court to ignore local law."   <u>Turner</u>, 2006 WL 566121 at *13.   Noting that a number of courts in other jurisdictions have "abrogated the [public duty] doctrine in favor of statutory enactments or general theories of negligence," she urges this Court as well to find that the doctrine "no longer serves the purposes for which it was conceived" and to allow the negligence claims to proceed.   Opp'n at 18-19.   As outlined above, the public duty doctrine is well-settled in this jurisdiction.   The D.C. Court of Appeals, which the Court is bound to follow on matters of local law, has set forth a robust and detailed body of law applying the public duty doctrine, and has re-affirmed it as recently as six months ago.   <u>See</u> <u>Varner v. District of Columbia</u>, 891 A.2d 260, 276-77 (D.C. 2006) ("[T]he public duty doctrine is well-established in this jurisdiction.").   The Court finds no justification for ignoring this well-settled controlling authority.

Because the District Defendants did not owe a special duty to Tyrone or to Plaintiff, therefore, the public duty doctrine applies and her negligence claims fail as a matter of law.[10]

**B.    Judgment on the Pleadings Must Be Entered in Dytrad's Favor on the Negligence Claims Because the Company Owed No Legal Duty to Plaintiff and Therefore Cannot Have Committed a Breach**

Defendant Dytrad, which at all relevant times operated the Gateway IV Group Home pursuant to its contract with the District, also moves for judgment on the pleadings as to Plaintiff's negligence claims.   Plaintiff's negligence claims against Dytrad are identical to those she has stated against the District Defendants.[11]

Dytrad contends that it cannot be held liable for the injuries Paul caused because "no legal duty ran from Dytrad to the Plaintiff or her decedent."[12]   <u>See</u> Dytrad's Mot. to Dismiss at 2.

---

[10]  Because the Court finds that Plaintiff's negligence claims cannot succeed on the merits, it will not discuss the District Defendants' alternative arguments that they are barred by the mandatory notice provisions of D.C. Code § 12-309 and the doctrine of discretionary immunity.  <u>See</u> District Defs.' Mot. at 25-32.

[11]  Those claims are: Negligence (Count II), Wrongful Death (Count III), Negligent Hiring and Supervision (Count IV), and Negligent Infliction of Emotional Distress.  <u>See</u> Am. Compl.  The negligence claims are Plaintiff's only claims against Dytrad.

[12]  Dytrad also argues that the statute of limitations has run on Plaintiff's Wrongful Death claim and moves the Court to dismiss it summarily on that ground.  <u>See</u> Opp'n at 6-7.  Because the Court concludes that Plaintiff cannot succeed on the merits on any of her negligence claims against Dytrad, it need not address Dytrad's procedural argument on the Wrongful Death claim.

Specifically, it argues that because Paul escaped from its custody sixty days prior to the attack, he was not within its control at the time of Tyrone's murder.  <u>See</u> <u>id.</u>  Dytrad further claims that it had no reason to know that Paul had violent propensities and, on that basis as well, is relieved from liability arising out of his conduct.  <u>See</u> Reply at 3.  Plaintiff maintains that Dytrad "had a duty to properly supervise juveniles as a result of its assumption of their care," and that it can be held liable for breaching that duty in this case.  <u>See</u> Opp'n at 6.

As noted <u>supra</u>, to succeed on her negligence claims, Plaintiff must establish: (1) that Dytrad owed a legal duty to her or her son; (2) that it breached that duty; and (3) that Dytrad's breach proximately caused the injuries alleged.  <u>Souci</u>, 763 A.2d at 99. It is axiomatic in tort law that an individual, or entity, generally has no duty to control the conduct of a third party and cannot be held liable for any injuries caused by another.  <u>See</u> Restatement (Second) of Torts § 315 (1965); <u>see</u> <u>also</u> <u>Committee of</u> <u>U.S. Citizens Living in Nicaragua v. Reagan</u>, 859 F.2d 929, 950 (D.C. Cir. 1988).  An exception exists, however, where one "takes control" of a third party whom he "knows or should know to be likely to cause bodily harm to others if not controlled."  <u>See</u> Restatement (Second) of Torts § 319 (1965).  In such a situation, the custodian has a duty to make reasonable efforts to prevent his ward from causing physical harm to others.  <u>See</u> <u>id.</u>; <u>see</u> <u>also</u>

<u>Thomas v. City Lights School</u>, 124 F. Supp. 2d 707, 711 (D.D.C. 2000).

Applying these principles to the instant facts, there is no question that Dytrad cannot be held responsible for the injuries that befell Tyrone and Plaintiff.  First, even assuming that Dytrad had a duty to control Paul while he was in its custody—which may or may not have been the case—that duty cannot have survived Paul's escape, especially given the length of time that elapsed between his abscondence and Tyrone's murder.  Plaintiff cites no authority, nor is the Court aware of any, supporting her contention that Dytrad remained liable for Paul's actions despite the sixty-day gap between the two events.

The sole case Plaintiff cites, <u>Thomas v. City Lights School</u>, actually appears to support Dytrad's position.  In <u>Thomas</u>, the plaintiff sued, alleging negligence, after he was attacked and injured by students of the defendant's school for at-risk youth while they were participating in a field trip to the National Zoo in Washington.  The court permitted the plaintiff to maintain his negligence claim on the ground that the school had a duty to make reasonable efforts to protect members of the public from its students during the field trip.  See <u>Thomas</u>, 124 F. Supp. 2d at 707.

In so holding, the <u>Thomas</u> court cautioned that the school was subject to third party liability only because of the high degree of

control it exercised over the students at the time of the injury, when they were in its direct control, and because it had prior knowledge that the students had dangerous propensities. Id. at 711-12. The court explained that a different outcome might be warranted if the school had insufficient "custodial control" over the students, or had no reason to believe that they posed a danger to others. Id. at 712 (collecting authority). City Lights is clearly distinguishable on its facts. Whereas the students in City Lights were under the school's direct control, and were participating in a school-sponsored event at the time they injured the plaintiff, Paul was far beyond Dytrad's "custodial control" at the time he killed Tyrone.[13] Taken to its logical conclusion, Plaintiff's theory would hold Dytrad liable in perpetuity for injuries caused by its former residents. Nothing in the case law or treatises supports that position.

Second, even assuming that Dytrad did have control over Paul at the time of the murder, it would only face liability if it knew, or should reasonably have known, that he had dangerous propensities. See Restatement (Second) of Torts § 319 (1965); Thomas, 124 F. Supp. 2d at 712. Dytrad argues, convincingly, that it did not have such knowledge. Both Dytrad and the District Defendants explain that juveniles who are determined to pose a

---

[13] The Court notes that even while Paul was under Dytrad's supervision, he remained a ward of the District of Columbia.

public danger are not assigned to group homes like Gateway IV because D.C. law prohibits employees at such facilities from using physical restraint or force against residents.  See Dytrad's Reply at 3; District Defs.' Reply at 18-19; D.C. MUN. R. § 29-6274.1. Juveniles whom the District believes to be dangerous are instead housed in higher-security facilities. See Dytrad's Reply at 2.

If the very fact that Paul was placed in Dytrad's care assumes that there had been a determination that he did not pose a danger to the public, Dytrad could not have had reason to believe that he was, in fact, dangerous.  See id. at 3.  Without such knowledge, Dytrad cannot be held liable for the injuries he caused.

In sum, because Dytrad did not have sufficient control over Paul at the time he killed Tyrone, and did not have reason to believe that he posed a danger to the public, Plaintiff cannot hold it responsible for the injuries Paul caused.  Judgment on the Pleadings must be entered in Dytrad's favor on Plaintiff's negligence claims.

## IV.  CONCLUSION

Accordingly, for the foregoing reasons, the District Defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [Dkt. No. 73] is hereby **granted** and Dytrad's Motion for Judgment on the Pleadings [Dkt. No. 81] is hereby **granted.**

An Order will issue with this Opinion.


August 30, 2006                    /s/_____
                                   Gladys Kessler
                                   U.S. District Judge

**Copies to**: **attorneys on record via ECF**